**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 6, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CLEMMETH D. NEVELS,

Defendant-Appellant.

No. 06-1240

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 04-CR-417-LTB)**

---

Neil MacFarlane, Westminster, Colorado, for Appellant.

Joshua Stein, Assistant United States Attorney (Troy A. Eid, United States Attorney, with him on the brief), Office of the United States Attorney, Denver, Colorado, for Appellee.

---

Before **TYMKOVICH**, **EBEL**, and **HOLMES**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Clemmeth D. Nevels was convicted of two federal firearm possession charges in March 2006 and was sentenced as an armed career criminal pursuant to

18 U.S.C. § 924(e)(1). On appeal, Nevels makes three arguments. *First*, he alleges that the disclosure of a government witness's existence three days prior to trial denied him a fair trial. *Second*, he contends that the government's introduction of expert testimony describing how he shot and killed an individual in his home was unfairly prejudicial in a firearms possession trial. *Third*, he asserts the district court erred in determining that one of his prior juvenile delinquency adjudications constituted a predicate offense under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1).

We take jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and AFFIRM.

## I. Background

Before dawn on January 11, 2004, Clemmeth Nevels made a 911 call requesting assistance at his Denver residence. Police found Nevels leaning against a car parked across the street from his house. He first identified himself as "Michael" and told the police that he discovered an intruder in his house. After revealing his true identity, he told the police that the intruder had a gun and said, "I think there's a body inside." ROA, vol. XIII, at 172. One officer testified that Nevels became agitated and angry at some point and that officers handcuffed him for their safety. Another officer heard Nevels claim, "I'm the shooter, there will be gun powder on my hands, it's my house, and I had to do what I had to do." *Id.* at 232.

2

Inside the house, the police discovered the body of Terrell McLamb on the couch. He had been shot seven times at short range and died on the way to the hospital. On the couch next to McLamb's left hand was a Ruger P89 semi-automatic pistol with an extended magazine. The chamber was fully loaded and had not been fired.

Another pistol was recovered in the same vicinity. This was a Ruger P95 semi-automatic pistol, with its serial number sanded down. This pistol had a 10-round magazine with two rounds remaining—one in the chamber and one in the magazine. Police discovered multiple bullet fragments and spent bullets. They all matched the P95 pistol. The police arrested Nevels at the scene.

The state subsequently charged Nevels with first degree murder and weapons possession by a prior offender. The charges were later dismissed in favor of two federal charges: (1) one count of possession of a firearm by a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1), and (2) one count of possession of a firearm with an altered serial number, in violation of 18 U.S.C. § 922(k). After a four-day trial, a jury convicted Nevels of both counts.

Since Nevels had two prior juvenile delinquency adjudications and one adult felony conviction, the district court found him to be an armed career criminal under 18 U.S.C. § 924(e)(1). The court sentenced him to 300 months on the first count and 60 months on the second, to be served concurrently.

## II. Analysis

Nevels alleges three claims challenging his conviction and sentence. We find each without merit.

### A. Pretrial Disclosure of Witness's Identity

Nevels first claims the district court erred in permitting the testimony of a witness who was disclosed to the defense just prior to trial. We review the admission of testimony from an unlisted government witness for abuse of discretion. *United States v. Sturmoski*, 971 F.2d 452, 458 (10th Cir. 1992).

The government learned of the existence of Shelly Barnett, Nevels's ex-wife, on Friday, March 3, 2006—three days before the beginning of trial. Based on an interview, prosecutors believed she would testify that she had seen Nevels with an identical semi-automatic pistol two weeks before the shooting and that Nevels and the victim were close friends. The government notified Nevels's defense counsel about Barnett's existence, her expected testimony and known impeachment information by email within an hour of her interview. The government also filed a formal notice with the district court on Sunday, March 5, the day before the trial was to begin. At the beginning of trial on March 6, Nevels's counsel objected to Barnett's testimony, claiming that the defense had no opportunity to investigate Barnett or her story. The district court found no violation of Federal Rule of Criminal Procedure 16's disclosure duty and permitted the government to introduce Barnett as a witness. Nevertheless, the

4

district court ordered the government to make Barnett available for the defense to interview that day. Barnett testified two days later on March 8—six days after Nevels's attorney was first notified she would testify.

"It is settled law in this circuit that, in the absence of a statutory or constitutional requirement, . . . there [is no] requirement that the government disclose its witnesses in any manner, except in a case where trial is for treason or other capital offense." *United States v. Baca*, 494 F.2d 424, 427 (10th Cir. 1974) (permitting government to conceal the name of an informant until trial); *see also Sturmoski,* 971 F.3d at 458 (finding no prejudice from an undisclosed government witness); *Moore's Federal Practice* § 616.02[3][a] ("[A] defendant in a noncapital case has no absolute right to obtain the names of government witnesses before trial.").

The Supreme Court has established that no *constitutional* right to pretrial discovery of witnesses exists in non-capital cases. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (holding that a defendant in a non-capital case has no right to discover lists of prospective government witnesses); *see also United States v. Russell*, 109 F.3d 1503, 1510 (10th Cir. 1997) ("In noncapital cases, moreover, there is no constitutional right to the pretrial disclosure of witnesses."). As *Weatherford* states, "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded." 429 U.S. at 559. Neither does this amount to a *Brady* violation since Barnett would not exculpate

5

Nevels. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (requiring pretrial disclosure of exculpatory evidence in the possession of prosecutors).

No statute or rule, moreover, requires pretrial disclosure of non-expert witnesses. Federal Rule of Criminal Procedure 16 provides limited discovery obligations on behalf of prosecutors. But it does not entitle defendants to discover the identity of government non-expert witnesses before trial. *Russell*, 109 F.3d at 1510. Under Rule 16(a)(2), a defendant may only discover statements made by prospective government witnesses as provided under the Jencks Act, 18 U.S.C. § 3500 (1976). The Jencks Act entitles a federal criminal defendant to obtain any pretrial statement and report made by a government witness, but only *after* the witness has testified on direct examination at trial. *United States v. Metropolitan Enterprises, Inc.*, 728 F.2d 444, 451 (10th Cir. 1984). Furthermore, the parties do not contend that Barnett was an alibi witness, thereby implicating the disclosure requirements of Rule 12.1. *See United States v. Pearson*, 159 F.3d 480, 483–84 (10th Cir. 1998).

Accordingly, in the absence of a court order,[1] the government was under no legal obligation to disclose Barnett's identity prior to trial. In fact, the

---

[1] The parties submitted witness lists to the district court on February 23, 2006. *See* ROA, vol. I, doc. 99 and 104. Yet, the district court expressly found that the late disclosure of Barnett's existence did not violate any discovery order. [ROA, vol. XIII, at 141–43]. Furthermore, it is in the sound discretion of the district court to admit or exclude unlisted witnesses. *United States v. Combs*, 267 F.3d 1167, 1178–80 (10th Cir. 2001).

government acted commendably in promptly informing Nevels's counsel about Barnett as soon as it learned of her potential testimony.

Nevels also asks us to apply the three factor test for assessing the propriety of court sanctions for discovery violations found in *United States v. Wicker*, 848 F.2d 1059 (10th Cir. 1988) and *United States v. Combs*, 267 F.3d 1167, 1179 (10th Cir. 2001), to overturn the district court's decision. He argues that we should examine: "(1) the reason for the delay in disclosing the witness; (2) whether the delay prejudiced the other party; and (3) the feasibility of curing any prejudice with a continuance." *Combs*, 267 F.3d at 1179; *see also United States v. Martinez*, 455 F.3d 1127, 1130 (10th Cir. 2006); *United States v. Muessig*, 427 F.3d 856, 864 (10th Cir. 2005).

But the government committed no discovery violation here. In any event, the record does not support the extreme sanction of excluding Barnett from trial. First, the government did not delay in disclosing Barnett nor does the record support the allegation that the late discovery of Barnett was the result of a lack of diligence on the government's part. Second, Nevels has failed to establish prejudice from the late disclosure. *See Sturmoski*, 971 F.2d at 458 (analyzing whether a "surprise witness" was prejudicial). He was allowed to interview the witness prior to her testimony and was able to cross-examine her effectively at trial. Nevels has pointed to nothing specific about Barnett's testimony or background that suggests additional time would have been helpful. While

7

perhaps given enough time Nevels may have discovered helpful information for impeachment purposes, on this record we are left only with speculation and conjecture that such information exists. Indeed, Nevels was able to elicit testimony that Barnett had a warrant for her arrest on the charge of false reporting or providing false information to the police.[2] Finally, Nevels never asked for a continuance of the trial.

Consequently, we find no abuse of discretion in the district court's decision to permit Barnett to testify.

## B.     Admission of Crime Scene Testimony

Nevels also claims that the district court erred in admitting the government's crime scene reconstruction expert testimony. The expert testified that Nevels shot McLamb seven times at close range, leading to his death. Nevels contends that such evidence was both irrelevant and unfairly prejudicial to the gun possession charges and should have been excluded under Rule 403 of the Federal Rules of Evidence.

We review this claim under a plain error standard since Nevels failed to timely renew his objection at trial after the district court previously denied without prejudice his pretrial motion to exclude the testimony. *See McEwen v.*

---

[2] Barnett also admitted to government investigators she had a 1997 felony conviction for attempted forgery. Nevels was aware of this information but failed to raise it during trial. Nevels was also able to examine Barnett on the stand about a 1998 conviction for providing false information to police. The record does not show whether this allegation was accurate.

8

*City of Norman*, 926 F.2d 1539, 1544 (10th Cir. 1991) (holding where a party objected to the admissibility of evidence in a motion in limine, but did not interpose an objection at trial, the issue was not preserved on appeal). Regardless of the standard of review, however, we find no error and affirm the district court's decision.

Rule 403 requires the trial court to balance the probative value of proffered evidence against the likelihood of unnecessary prejudice to the defendant. "In performing the [Rule] 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Deters v. Equifax Credit Info. Servs.*, 202 F.3d 1262, 1274 (10th Cir. 2000) (internal quote omitted). Moreover, "[e]vidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly or apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Leonard*, 439 F.3d 648, 652 (10th Cir. 2006). The assessment of the evidence is left to the sound discretion of the trial court.

Here, the district court found that the reconstruction expert's testimony was probative considering that Nevels's theory of the case rested on self-defense or justification. In opening argument, Nevels's defense counsel raised the fact that McLamb was an armed fugitive and a violent man and repeatedly claimed that Nevels's possession of the gun at the time of the shooting was justifiable self

defense. In essence, Nevels suggested that the gun was not his and he only gained possession of the gun (presumably from McLamb) to defend himself against McLamb.[3] The expert's testimony directly contradicted this scenario since the evidence showed that Nevels was the only one to fire a weapon and that the victim was shot at close range and in a defensive position. Accordingly, the expert testimony went directly to disproving an element of Nevels's affirmative defense and was thus relevant.

While the testimony about the nature of the killing might elicit some emotional response from the jury, Rule 403 does not protect a party from all prejudice, only "unfair prejudice." *Deters,* 202 F.3d at 1274. Nevels has not shown unfair prejudice. First, the district court mitigated the effect of the testimony by instructing the jury that any evidence about McLamb's death was admitted only for the limited purpose of showing whether and under what circumstances Nevels possessed the gun. [ROA, Tr. 10, 606]. Second, the

---

[3] In order to gain the benefit of the affirmative defense of justification, he had to prove by the preponderance of evidence:

> (1) The defendant was under an unlawful and present, [sic] threat of death or serious bodily injury;
> (2) The defendant did not recklessly or negligently place himself in a situation where he would be forced to engage in the criminal conduct;
> (3) The defendant had no reasonable legal alternative; and
> (4) There was a direct causal relationship between the criminal action and the avoidance of the threatened harm.

Jury Instruction No. 33, ROA, vol. I, doc. 116; *see also United States v. Butler,* 06-5027, __ F.3d __, 2007 WL 1314520 at *2 (10th Cir. May 7, 2007).

10

testimony was relevant to rebutting the defense of justification by establishing an alternative explanation to that offered by Nevels. Where the defendant's theory of defense directly provides for the introduction of rebuttal crime scene evidence, it cannot be said that the evidence was per se "unfairly prejudicial." We leave it to the trial court to assess its prejudicial effect—the defense's invitation to introduce this evidence cannot be rescinded once its stratagem does not work, especially since the district court exercised care in instructing the jury regarding the scope of the evidence as it applied to the affirmative defense. Finally, we doubt the expert's testimony was especially prejudicial given the fact that Nevels's own defense counsel conceded the shooting in her opening statement.

Consequently, it cannot be said that the expert testimony's "probative value [was] substantially outweighed by the danger of unfair prejudice." *Fed. R. Evid. 403*. The district court did not err in allowing the testimony.

### C. Armed Career Criminal Enhancement

Finally, Nevels argues that the district court erred in sentencing him as an armed career criminal under 18 U.S.C. § 924(e)(1).

The district court designated Nevels an armed career criminal based on two acts of juvenile delinquency and one adult felony conviction. He contends the district court erroneously applied the so-called "categorical approach," which only looks to the fact of conviction in determining that a juvenile conviction may serve as a predicate offense under the ACCA. Nevels claims instead that the

11

district court should have examined the underlying facts of his juvenile conviction and found that it did not constitute an ACCA offense. We review this legal question *de novo*. *United States v. Begay,* 470 F.3d 964, 967 (10th Cir. 2006).

**1.**

The ACCA enhances a sentence to a mandatory minimum of fifteen years for a felon convicted of possessing a firearm with "three previous convictions . . . for a violent felony or a serious drug offense." 18 U.S.C. § 924(e)(1). In relevant part, the ACCA defines a "violent felony" as

> [A]ny crime punishable by imprisonment for a term exceeding one year, or *any act of juvenile delinquency involving the use or carrying of a firearm*, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that--
>
> (I) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]

18 U.S.C. § 924(e)(2)(B) (emphasis added).

In a series of recent cases, the Supreme Court has provided guidance to sentencing courts on how to determine whether a defendant has been convicted of a "violent felony" for purposes of the ACCA. In the first case, *Taylor v. United States*, 495 U.S. 575 (1990), the Court considered whether sentencing courts may examine evidence beyond the statutory definitions of a conviction to determine if it satisfies the ACCA's predicate crime requirement. Recognizing that states

often employ varying definitions for a burglary, the Court held that sentencing courts must use the "categorical approach" in determining whether a state conviction for "burglary" constitutes an ACCA predicate offense. Under the categorical approach, courts should look "only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." *Id.* at 600. Sentencing courts, moreover, should steer clear of the "exact definition or label" of the conviction and instead should focus on the "basic elements" of the conviction. *Id.* at 599. If the statutory elements are consistent with the generic elements of burglary, then the conviction satisfies a "violent felony." *Id.*

In two subsequent cases, the Supreme Court has reaffirmed this approach. In *Shepard v. United States*, 544 U.S. 13, 19–21 (2005), the Court applied the categorical approach for convictions based on guilty pleas, not only convictions. And recently, in *James v. United States*, 550 U.S. ___ (2007), the Court reaffirmed the categorical approach under the ACCA, applying it to convictions for *attempted* burglary.

We thus look primarily at the fact of conviction in assessing the application of the ACCA. In a "narrow range of cases," however, the Court authorized looking beyond the statutory elements of a conviction. *Taylor*, 495 U.S. at 602. First, "where a statute is ambiguous (i.e., reaches different types of conduct) and a defendant's conviction followed a jury trial, the court may look to charging documents and jury instructions to determine if the actual offense the defendant

13

was convicted of qualifies as a crime of violence." *United States v. Moore*, 420 F.3d 1218, 1220 (10th Cir. 2005) (citing *Taylor*, 495 U.S. at 602). Second, "[w]here the statute is ambiguous and the defendant was convicted by a guilty plea, the court can review the charging document, written plea agreement, transcript of the plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Id.* (citing *Shepard*, 544 U.S. at 16); *see also United States v. Taylor*, 413 F.3d 1146, 1156–58 (10th Cir. 2005).

**2.**

The district court utilized the categorical approach in finding Nevels's two juvenile crimes constitute "violent felon[ies]" under the § 924(e)(1). On March 27, 1990, Nevels pleaded guilty to two counts of aggravated robbery as a juvenile. Under *Shepard*, sentencing courts are permitted to review a charging document where the defendant pleads guilty to a crime. 544 U.S. at 16. According to the "Petition in Delinquency" that served as the charging document in his guilty plea, at the age of eleven, Nevels participated in two aggravated robberies in violation of Colorado Revised Statute § 18-4-302(1)(c).[4] *See* ROA, vol. I, doc. 45, attach.

---

[4] A person who commits robbery is guilty of aggravated robbery if during the act of robbery or immediate flight therefrom:

(c) He has present a confederate, aiding or abetting the perpetration of the robbery, armed with a deadly weapon, with the intent, either on the part of the defendant or confederate, if resistance is offered, to kill, maim, or wound the person robbed or any other person, or by the use of

(continued...)

1–5. In both counts, the Petition stated that "defendant [Nevels], and a confederate . . . by use of force, threats and intimidation with a deadly weapon, to-wit: GUN, . . . knowingly put said victim . . . in reasonable fear of death" during the course of a robbery. *Id.* Based on this document, the district court found this an "act of juvenile delinquency involving the use or carrying of a firearm" which threatens physical force and thus qualifies as a "violent felony" under § 924(e). [ROA, vol. XVII, at 8–12].

Nevertheless, Nevels argues that this analysis was flawed and suggests that the district court should have determined that (1) a gun was actually present at the crime and (2) *he* actually carried or used a firearm in the crime. Nevels points to his presentencing report (PSR) that indicates he did not actually carry or use a firearm in at least one of his prior juvenile adjudications. He also claims the PSR fails to establish that a gun was even present at the incident. According to the PSR, an older confederate, who had his hands in his pockets, claimed to have a gun and threatened the use of force with a gun. Based on this document, Nevels argues the district court should have looked beyond the mere fact of conviction and examined the underlying facts of conviction to determine if the juvenile adjudication may serve as a predicate offense under the ACCA. Nevels contends

---

[4](...continued)
force, threats, or intimidation puts the person robbed or any other person in reasonable fear of death or bodily injury[.]

Colo. Rev. Stat. § 18-4-302(1)(c) (West 1989).

15

the ACCA's statutory language—the specific phrase "involving the use or carrying a firearm" after the phrase "act of juvenile delinquency"—requires the district court to *factually* determine that Nevels used or carried a firearm. We disagree.

First of all, Nevels cites no authority or case law for his construction of the ACCA and no basis exists for it. The fact that Congress intended juvenile adjudications to involve a firearm or some other destructive device does not alter the well-established process by which sentencing courts conduct the ACCA analysis. Finding that a juvenile act "involv[ed] the carrying or use of a firearm" is no different than finding that a conviction satisfied the elements of burglary. If a sentencing court determines from the statutory definitions of conviction or the approved *Taylor-Shepard* supporting documents[5] that there was (1) a qualifying act of juvenile delinquency, and it (2) involved the use or carrying of a firearm, then no further inquiry is necessary under the ACCA.

Second, even if the sentencing court accepted the argument that Nevels did not possess a firearm during the juvenile offense, Colorado law makes it an act of delinquency to aid or abet someone who did carry a firearm. Furthermore, the ACCA only requires the juvenile act to "*invol[ve]* the carrying or use of a firearm"—it does not require the defendant to personally carry or use the firearm if the weapon was otherwise "involved" in the act.

---

[5] A presentencing report is not included among these documents.

16

**3.**

Nevels finally suggests that *Taylor* and *Shepard* are limited to convictions or guilty pleas for burglary. While it is true that *Taylor* and *Shepard* involved only burglary convictions and pleas, we have applied the categorical approach to a broader array of issues. *See, e.g., Moore*, 420 F.3d at 1218 (applying categorical approach to USSG § 4B1.2 "crime of violence" enhancement); *United States v. Begay*, 470 F.3d 964, 966–975 (10th Cir. 2005) (applying categorical approach in holding that a DUI is a "violent felony" under the ACCA); *United States v. Harris*, 447 F.3d 1300, 1304 (10th Cir. 2006) (applying categorical approach to ACCA "separateness of prior crimes" inquiry). Indeed, several circuits have already applied the categorical approach to juvenile adjudications. *See, e.g., United States v. Richardson*, 313 F.3d 121 (3d Cir. 2002); *United States v. Wells,* 473 F.3d 640, 646–50 (6th Cir. 2007); *United States v. Kirkland*, 450 F.3d 804, 806–08 (8th Cir. 2006); *United States v. Burge*, 407 F.3d 1183, 1187 (11th Cir. 2005).

In any event, the rationale for the categorical approach for burglary convictions applies with equal force to juvenile adjudications. First, as the Supreme Court observed, "the language of § 924(e) generally supports the inference that Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Taylor*, 495 U.S. at 600.

Section 924(e)(1) applies to a person who has three previous "convictions"—not to a person who has *committed* three offenses. *Id.*

Second, the purpose of the categorical approach is to avoid conducting "a fact finding inquiry, thereby sparing [the sentencing court] from conducting mini-trials on prior offenses which have already been adjudicated." *United States v. Austin*, 426 F.3d 1266, 1270 (10th Cir. 2005); *see also Taylor*, 495 U.S. at 601 ("[T]he practical difficulties and potential unfairness of a factual approach are daunting."). Such a purpose applies even more so to juvenile adjudications, where their dispositions may be long in the past.

Third, the categorical approach often redounds to the benefit of defendants. Under the categorical approach, defendants may only receive a sentence enhancement for facts established by a plea of guilty or a jury verdict. *Cf. United States v. Booker*, 543 U.S. 220, 232 (2005) (It is "the defendant's right to have the jury find the existence of any particular fact that the law makes essential to his punishment. That right is implicated whenever a judge seeks to impose a sentence that is not solely based on facts reflected in the jury verdict or admitted by the defendant." (internal quotations and citations omitted)). Permitting sentencing courts to look beyond the mere fact of conviction potentially increases the number of ACCA enhancements. While the categorical approach here may have foreclosed the discovery of evidence mitigating Nevels's involvement in the juvenile offenses, in the vast number of cases that will not be true.

18

Finally, Nevels's argument underscores the dangers in allowing sentencing courts to wade into the details of prior convictions. He asserts at the time of his delinquent act that he was only eleven, physically small, immature and under the influence of an older child. In effect, he argues that his prior conviction was illegitimate. Under Nevels's approach, the ACCA effectively becomes an impermissible tool to collaterally attack the prior conviction.

For all of these reasons, the district court did not err in applying the ACCA to enhance Nevels sentence.[6]

## III. Conclusion

For the foregoing reasons, Nevels's claims are without merit and we AFFIRM his conviction and sentence.

---

[6] Nevels also argues that because his juvenile adjudications are defined under Colorado state law to be "delinquent acts" rather than "crimes," his convictions fall outside the definition of the ACCA. We disagree. Section 924(e)(2)(B) expressly provides that acts of juvenile delinquency are included in the definition of "violent crimes" if the acts are punishable by a term of one year if "committed by an adult." A violation of Colorado Revised Statute § 18-4-302 (West 1989), if committed by an adult, was punishable by a term of imprisonment of between 4 and 16 years. *See* Colo. Rev. Stat. §§ 18-4-302(3) and 18-1-105(1)(a)(III)(A) (West 1989).